IN THE SUPREME COURT OF NORTH CAROLINA

2022-NCSC-66

No. 441A20

Filed 17 June 2022

IN THE MATTER OF: A.A.

Appeal pursuant to N.C.G.S. § 7B-1001(a1)(1) (2019) from an order entered on 12 August 2020 by Judge Marion Boone in District Court, Surry County. Heard in the Supreme Court on 5 October 2021.

*James N. Freeman Jr. for petitioner-appellee.*

*No brief for appellee Guardian ad Litem.*

*Peter Wood for respondent-appellant mother.*

MORGAN, Justice.

¶ 1    In this private termination of parental rights case, we consider issues of the trial court's subject matter jurisdiction and its substantive determinations in the proceeding. First, we address the question of whether petitioner, as the stepmother of the juvenile who is the focus of this matter, had standing to bring a private termination of parental rights action against respondent-mother, the child's biological mother. If we conclude that petitioner had standing to initiate the termination action, then we must additionally consider respondent-mother's arguments that the trial court erred (1) in finding that the ground of abandonment existed for termination of parental rights, and (2) in concluding that termination of

respondent-mother's parental rights was in the child's best interests.

Upon careful review, we hold that petitioner satisfied the relevant statutory requirements to file a private petition for termination of parental rights. We further conclude that clear, cogent, and convincing evidence of abandonment, as defined in both statutory law and case law, was presented at the adjudication hearing to establish that this ground existed for the termination of respondent-mother's parental rights. Lastly, the trial court did not abuse its discretion in concluding that it was in the child's best interests to terminate the parental rights of respondent-mother. Accordingly, we affirm the trial court's order terminating respondent-mother's parental rights.

## I.  Factual Background and Procedural History

Respondent-mother gave birth to a daughter "Amy" on 5 August 2010.[1] Amy's father was granted primary custody of Amy in 2012. Petitioner and Amy's father became involved in a romantic relationship in October 2013, and petitioner, Amy's father, and Amy began residing together later in the year. On 30 April 2015, petitioner and Amy's father married each other; the couple had two children together: a son born in April 2015 and a daughter born in March 2017. Petitioner and Amy's father separated in October 2017 and became divorced on 14 January 2019.

---

[1] We employ a pseudonym for the juvenile to protect her privacy and for ease of reading.

On 31 May 2018, petitioner filed an action against respondent-mother and Amy's father in District Court, Surry County, seeking full custody of Amy. In the custody complaint, petitioner alleged that respondent-mother and Amy's father were incarcerated in the Surry County Jail at the time of the filing of the action and that Amy had continued to live with petitioner since petitioner's marriage to the father, even after petitioner and Amy's father separated. Petitioner further alleged the occurrence of two incidents of domestic violence by Amy's father toward petitioner in the presence of one or more of the children. Petitioner stated that after the father exercised visitation with Amy and one of Amy's half-siblings on 22 January 2018, petitioner and Amy's father had a verbal argument which resulted in a "physical outburst" by the father and his destruction of petitioner's kitchen table and chairs in the presence of their youngest child. Petitioner also described an altercation on 1 May 2018 between the father and their two biological children which transpired during a visit to a fast-food restaurant, leading petitioner to seek criminal charges against the father and to seek a domestic violence protective order. Amy's father was arrested later in the day after picking up Amy early from school and then, with Amy in his car, circling the domestic violence office in Surry County where petitioner was discussing the domestic violence incident at the fast-food restaurant which had occurred.

On 31 May 2018, petitioner was granted temporary legal and physical custody

of Amy, and on 23 July 2018, petitioner was granted exclusive legal and physical custody of Amy upon the trial court's finding that respondent-mother and Amy's father had "acted contrary to their constitutionally protected status as biological parents." Respondent-mother was granted two hours of supervised visitation with Amy weekly. However, respondent-mother did not utilize the visitation with the juvenile which was available to her and had only one in-person visit with Amy over the course of the next eleven months. Although respondent-mother requested a visit with Amy on 6 August 2018—the day after Amy's birthday—respondent-mother was not punctual in her arrival for the visit at the location where petitioner and respondent-mother had agreed that the visit would occur, which was a local library. Respondent-mother also failed to attend a court-ordered custody mediation regarding Amy in late September 2018. Respondent-mother did have a visit with Amy on 23 September 2018. On 25 September 2018, respondent-mother requested another visit with the child, but when petitioner asked respondent-mother to send a text message to petitioner during the following week in order to arrange details of the proposed visit, respondent-mother did not do so. The next contact which petitioner had with respondent-mother occurred on 12 May 2019, which was Mother's Day. On this occasion, respondent-mother sent the following text message to petitioner: "This is [respondent-mother]. Happy Mother's Day. Thank you for always loving mine and treating mine as your own."

¶ 6        On 13 May 2019, petitioner filed a private petition to terminate respondent-mother's parental rights to Amy, alleging willful abandonment of the minor child within the meaning of N.C.G.S. § 7B-1111(a)(7) as the grounds for termination. Petitioner alleged that respondent-mother did not exercise respondent-mother's visitation rights with Amy at any time after 23 September 2018, that respondent-mother also chose not to send Amy any gifts, cards, or other correspondence from this identified juncture, and that respondent-mother never attempted to communicate with Amy by telephone or any other means.

¶ 7        During the adjudication hearing which took place on 24 July 2020,[2] petitioner testified that she had heard nothing from respondent-mother for eight months after September 2018 until respondent-mother sent petitioner the aforementioned Mother's Day text message on 12 May 2019. On this occasion, however, respondent-mother did not ask to speak to Amy or inquire about Amy's wellbeing. Although respondent-mother had a mailing address for Amy and knew petitioner's telephone number, nonetheless Amy never received any cards, gifts, food, clothing, or other items from respondent-mother; respondent-mother never assisted with Amy's school, medical, or emotional needs; and in the handful of text messages that respondent-

---

[2] At the start of the adjudication hearing, petitioner's counsel asked the trial court "to take judicial notice at this time of the files . . . that were handed up before court began this morning . . . [a] child support file, custody files, and . . . a Domestic Violence Protective Order." Counsel for respondent-mother stated that respondent-mother had no objection to the trial court taking judicial notice of these court files.

mother sent to petitioner—in August 2019, March 2020, April 2020, and May 2020—respondent-mother never requested a visit with Amy or asked to speak with the child after Amy's birthday on 5 August 2019. In her August 2019 birthday telephone call to Amy, respondent-mother told the juvenile that respondent-mother had gifts and a card for Amy and confirmed a mailing address with petitioner, but no such gifts or card were ever received.

¶ 8         Amy's father testified at the adjudication hearing that he did not believe that respondent-mother had any contact with Amy after September 2018 but acknowledged that his information was limited in light of the fact that he had been incarcerated for eighteen months out of the three years which preceded the adjudication hearing. The father also acknowledged that he had maintained control of the financial card onto which child support payments made by respondent-mother for the benefit of Amy were deposited and that he was using the funds himself which were deposited on the card, even though Amy had been in petitioner's sole custody for two years. Amy's father explained that while he was aware that the funds were intended for Amy's support, he believed that the State—not the father—had the responsibility to ensure that the child or her custodian was receiving the money which was paid for child support.

¶ 9         Respondent-mother testified that "at the end of 2018" she moved from Surry County, where Amy resided with petitioner, to Raleigh "to better [her] life."

Respondent-mother related that she had been previously incarcerated on drug charges but represented that at the time of the adjudication hearing she had been "clean" for six months. Respondent-mother acknowledged that "[t]here isn't much of a relationship" between petitioner and her. When asked during her testimony why she had not tried to contact petitioner about Amy more than once after September 2018, respondent-mother replied, "Honestly, I just had just kind of given up at that point. And I didn't want to cause any more issue or drama or stress." Respondent-mother also testified that her wages had been garnished for six or seven years to provide child support for Amy, but respondent-mother admitted that she was aware that these funds were going to the father even though respondent-mother also knew that petitioner had obtained sole custody of Amy in 2018.

¶ 10    In a termination order filed on 12 August 2020, the trial court made findings of fact regarding, *inter alia*, the custody complaint filed by petitioner and the resulting award of custody, of which the trial court took judicial notice; respondent-mother's repeated failure to attend mediation sessions which were ordered as part of the custody proceedings; respondent-mother's failure to exercise visitation with Amy with the sole exception of a visit on 23 September 2018; respondent-mother's only telephone call to Amy after July 2018 which occurred on 6 August 2019; respondent-mother's failure to provide clothing, food, gifts, or involvement with Amy's school, counseling, or medical care; respondent-mother's awareness that her child support

payments obtained through garnishment of her wages were actually going to the father and not to petitioner as Amy's custodian for the care and support of the child; respondent-mother's choice to move her residence from Surry County to Raleigh, far from Amy's home; and respondent-mother's acknowledgment that she "basically gave up" with regard to contacting petitioner about Amy and was grateful to petitioner for loving Amy and "treating her like [petitioner's] own." Based upon these findings of fact, the trial court concluded that petitioner had proven "by clear, cogent, and convincing evidence that [r]espondent has abandoned the minor child within the meaning of North Carolina General Statute § 7B-1111(a)(7)."

The trial court then moved to the disposition stage and ultimately entered an order which included, *inter alia*, the following finding of fact addressing statutory considerations as specified in N.C.G.S. § 7B-1110(a):

> 2. The [trial c]ourt evaluated the evidence by the standard of the best interest of the minor child, and considered the statutory criteria located in [N.C.G.S.] § 7B-1110:
>
>> a. Age of the juvenile: The minor child is almost ten years old.
>>
>> b. The likelihood of adoption of the juvenile: There is strong evidence that the minor child will be adopted by [p]etitioner.
>>
>> c. Whether termination will aid in a permanent plan: Adoption of the minor child by [p]etitioner would aid in a plan of adoption and provide permanence for the minor child.

d. Bond between the juvenile and the parent: The [trial c]ourt finds that there is a familiarity between the minor child and the memory of her biological mother, but there is no bond as a mother and child.

e. Quality of relationship between the child and the adoptive parent: The [trial c]ourt finds this relationship is very strong.

f. Any other relevant consideration: The [trial c]ourt incorporates the findings of fact from the Adjudicatory hearing, and finds that [p]etitioner has been the minor child's mother for all intents and purposes.

The trial court then concluded that it was in the juvenile Amy's best interests to terminate respondent-mother's parental rights to the child. Respondent-mother entered written notice of appeal to this Court on 27 August 2020, and the matter was heard by this Court on 5 October 2021.

## II. Analysis

Respondent-mother advances three arguments in her appeal to this Court: first, that petitioner did not establish that petitioner had standing to file a petition for termination of respondent-mother's parental rights to Amy; second, that the trial court erred in finding the existence of the ground of abandonment pursuant to N.C.G.S. § 7B-1111(a)(7) which provided the basis for the termination of respondent-mother's parental rights; and third, that the trial court abused its discretion in concluding that termination of the parental rights of respondent-mother was in the juvenile Amy's best interests where the guardian ad litem did not recommend

termination and Amy did not wish for respondent-mother's parental rights to be terminated. As discussed below, we find each of respondent-mother's arguments to be unpersuasive, and as a result, this Court affirms the order terminating her parental rights.

### A. Standing

¶ 13 Respondent-mother contends that petitioner lacked standing to file a petition for the termination of respondent-mother's parental rights to the juvenile Amy. Respondent-mother claims that the termination of parental rights petition did not specifically allege that Amy had lived with petitioner for the two years immediately preceding the filing of the petition and that the trial court made no finding of fact in the termination of parental rights order about petitioner's standing to initiate the action or the duration of time that Amy had lived with petitioner. Respondent-mother also suggests that Amy might have lived with someone other than petitioner at some point during the relevant statutory time period. For these reasons, respondent-mother asserts that the trial court erred in allowing petitioner's termination of parental rights action to proceed. After thoughtful consideration of respondent-mother's arguments, the pertinent statutory law and case law, and the record in this case, we disagree with respondent-mother's position.

> "Whether or not a trial court possesses subject-matter jurisdiction is a question of law that is reviewed de novo. Challenges to a trial court's subject-matter jurisdiction may be raised at any stage of proceedings, including for the

> first time before this Court." *In re A.L.L.*, 376 N.C. 99, 101,
> 852 S.E.2d 1 (2020) (extraneity omitted). However, "[t]his
> Court presumes the trial court has properly exercised
> jurisdiction unless the party challenging jurisdiction meets
> its burden of showing otherwise." *In re L.T.*, 374 N.C. 567,
> 569, 843 S.E.2d 199 (2020).

*In re M.R.J.*, 378 N.C. 648, 2021-NCSC-112, ¶ 19 (alteration in original). One issue that could implicate subject matter jurisdiction is the standing of a party to initiate a particular action. *Id.* ¶¶ 21, 41. On the matter of standing, the North Carolina Juvenile Code provides that "[a] petition or motion to terminate the parental rights of either or both parents to his, her, or their minor juvenile may only be filed by," *inter alia*, "[a]ny person with whom the juvenile has resided for a continuous period of two years or more next preceding the filing of the petition or motion." N.C.G.S. § 7B-1103(a) (2019).[3] Where challenged, "the record must contain evidence sufficient to sustain a finding [of standing]." *Mangum v. Raleigh Bd. of Adjustment*, 362 N.C. 640, 647 (2008); *see also In re L.T.*, 374 N.C. 567, 569 (2020).

¶ 14        In the petition for termination of parental rights, petitioner alleged that she and Amy's father "had primary legal and physical custody of" Amy "during their marriage," which the petition further alleged existed from 30 April 2015 to 14

---

[3] This subsection was amended, effective 1 October 2021, while applying to actions filed or pending on or after that date, to reduce the pertinent time period of the juvenile's residence with a petitioner from "two years" to "18 months." Act of Sept. 1, 2021, S.L. 2021-132, § 1(*l*), 2021 N.C. Sess. Laws 165, 170. Hence, the law, in its amended form, does not apply to the present case.

January 2019. The petition alleged that Amy continued to reside with petitioner after the end of petitioner's marriage to the father and that the juvenile still resided with petitioner as of the 13 May 2019 date of the petition's filing. In the 31 May 2018 complaint seeking custody of Amy that petitioner filed against respondent-mother and the father, of which the trial court took judicial notice in its decision in the instant case, petitioner alleged that Amy had resided with petitioner since the separation of petitioner and the child's father in October 2017. These filings alone provide a sufficient foundation to support a determination that petitioner had standing to initiate the termination of parental rights action based upon the allegations of petitioner, and buttressed by the judicial notice of documentation by the trial court, that the juvenile Amy had resided with petitioner for a continuous period of two years or more next preceding the filing of petitioner's petition.

¶ 15       In addition to the allegations contained in the termination of parental rights petition and in the custody complaint, several trial court orders of which the trial court in this case took judicial notice and which are included in the record on appeal in this case also show that petitioner's allegations demonstrate her standing to bring this action. The custody order, which was filed on 23 July 2018 and issued by the same trial court in which the instant case was pending, awarded full custody of the juvenile Amy to petitioner; this custodial arrangement has continued since that date. That custody award, in turn, followed an order entered on 31 May 2018 in which

petitioner was granted temporary legal and physical custody of Amy. These court orders established that petitioner had sole physical custody of Amy for at least one year of the pertinent two-year period preceding the filing of the termination petition, and the trial court orders corroborate the position of petitioner.

¶ 16    Furthermore, respondent-mother did not introduce *any* evidence at the adjudication hearing which suggested that the child Amy resided with anyone other than petitioner during the two years preceding the filing of the termination of parental rights petition. Indeed, there was no evidence presented by any party at the adjudication hearing, or otherwise introduced into the record, to suggest that Amy resided outside of petitioner's home at any point during the statutory time period. On appeal, respondent-mother does not cite any evidence which would support a determination by the trial court that petitioner lacked standing to file the petition for termination of parental rights and instead relies solely upon an argument that standing was not established due to the lack of express statements regarding the subject of standing in the termination order. To the contrary, petitioner testified that petitioner and Amy's father began living together in late 2013, along with Amy, who was three years old at the time and in the sole custody of her father.

¶ 17    In sum, the record in this case indicates that Amy continuously resided with petitioner—whether with or without the father—from at least late 2013 through 13 May 2019, the date on which the petition to terminate parental rights was filed. This

period of more than five years not only encompasses but clearly exceeds the "continuous period of two years" preceding the filing of the petition as specified in the statute which defines those persons who have standing to file a petition for termination of parental rights. N.C.G.S. § 7B-1103(a)(5). Nothing in the Juvenile Code requires a petitioner to utilize any specific language in a petition for termination of parental rights to establish the party's standing to bring the termination proceeding. Similarly, no authority in the Juvenile Code or precedent from this Court requires the trial court to make a specific finding of fact regarding a petitioner's standing; therefore, it is of no consequence that the trial court did not elect to enter an explicit recognition of petitioner's standing to initiate the case, especially since respondent-mother did not raise the issue during either the adjudication or the disposition hearing.

¶ 18        In light of the evidence of record in this matter, we conclude that petitioner had standing to file a petition for termination of respondent-mother's parental rights to Amy because Amy had been residing with petitioner "for a continuous period of two years or more next preceding the filing of the petition or motion." N.C.G.S. § 7B-1103(a)(5). Accordingly, respondent-mother's argument on this issue is unpersuasive.

**B. Abandonment as a ground for termination of parental rights**

¶ 19        In her second argument, respondent-mother contends that the evidence in this case did not support the trial court's Findings of Fact 14, 15, 20, 21, and 28. She also

asserts that Finding of Fact 29 and Conclusion of Law 3 were not proven by clear, cogent, and convincing evidence and that both erroneously establish that the ground of abandonment existed for the potential termination of her parental rights. *See* N.C.G.S. § 7B-1111(a)(7) (2021) (providing that a person's parental rights may be terminated if "[t]he parent has willfully abandoned the juvenile for at least six consecutive months immediately preceding the filing of the petition"). Specifically, respondent-mother submits that her testimony at the adjudication hearing that she maintained communication with petitioner and Amy's father through text messages and telephone calls and "paid child support every month, as court ordered, for Amy" was sufficient to prevent the trial court from determining the existence of abandonment as a ground for termination of respondent-mother's parental rights. We disagree with this argument.

¶ 20        In an action seeking termination of parental rights, adjudication is the first stage of a two-stage process. N.C.G.S. § 7B-1109 (2021). At this initial stage, the petitioner bears the burden of proving by "clear, cogent, and convincing evidence" the existence of at least one ground for termination as specified under subsection 7B-1111(a) of the General Statutes of North Carolina. N.C.G.S. § 7B-1109(f). We review a trial court's adjudication of the existence of a ground for termination as provided in N.C.G.S. § 7B-1109 "to determine whether the findings are supported by clear, cogent and convincing evidence and the findings support the conclusions of law." *In re*

*Montgomery*, 311 N.C. 101, 111 (1984). The trial court's conclusions of law are reviewed de novo on appeal. *In re C.B.C.*, 373 N.C. 16, 19 (2019).

¶ 21        In the context of a termination of parental rights proceeding, the ground of "[a]bandonment implies conduct on the part of the parent which manifests a willful determination to forego all parental duties and relinquish all parental claims to the child." *In re Young*, 346 N.C. 244, 251 (1997) (quoting *In re Adoption of Searle*, 82 N.C. App. 273, 275 (1986)). Where "a parent withholds [her] presence, [her] love, [her] care, the opportunity to display filial affection, and willfully neglects to lend support and maintenance, such parent relinquishes all parental claims and abandons the child." *Pratt v. Bishop*, 257 N.C. 486, 501 (1962). Although a parent's acts and omissions, which are at times outside of the statutorily provided period, may be relevant in assessing a parent's intent and willfulness in determining the potential existence of the ground of abandonment, the dispositive time period is the six months preceding the filing of the petition for termination of parental rights. *In re C.B.C.*, 373 N.C. at 22–23; *see also* N.C.G.S. § 7B-1111(a)(7). Here, the six-month time period preceding the filing of the petition for the termination of parental rights extends from 13 November 2018 to 13 May 2019.

¶ 22        Respondent-mother offers that there was evidence adduced at the adjudication hearing indicating that respondent-mother: contacted petitioner and Amy's father regarding Amy such that petitioner did not fail to "act[ ] as a normal parent would,"

which is pertinent to Finding of Fact 14; paid child support in good faith during the relevant time period and did not know or willfully intend that those funds would go to the father rather than to petitioner to support Amy, which is pertinent to Findings of Fact 14, 15, and 20; had no duty to act affirmatively to modify the governing child support order to redirect her garnished wages to petitioner, which is pertinent to Finding of Fact 21; and did not fail to "act[ ] in any other manner consistent with being a parent," which is pertinent to Finding of Fact 28. Respondent-mother is correct that such evidence appears in the record; it was introduced at the adjudication hearing by means of respondent-mother's own testimony. However, respondent-mother conveniently fails to acknowledge or otherwise address the fact that petitioner, Amy's father, and even respondent-mother herself all provided testimony during the adjudication hearing that contradicted respondent-mother's claims of involvement with Amy during the relevant statutory period for abandonment and which could support the challenged findings of fact.

¶ 23     For example, petitioner testified at the adjudication hearing that: respondent-mother's last in-person visit with Amy was in September 2018, which is a point in time outside of the pertinent six-month statutory timeframe for determining abandonment; respondent-mother's last telephone conversation with Amy was on 6 August 2019, also outside of the six-month time period addressed by the statute; respondent-mother did not ask petitioner about Amy's wellbeing in the single text

message which respondent-mother sent to petitioner during the relevant statutory time span; respondent-mother did not send Amy any cards, gifts, or other tokens of affection during the six months immediately preceding the filing of the petition; and petitioner did not have access to any funds garnished from respondent-mother's wages for the support of Amy during this period of time which is statutorily relevant to the existence of the ground of abandonment. Respondent-mother related in her testimony that she was aware that the funds which were garnished from her wages for purposes of child support were going to Amy's father rather than going to petitioner, who had sole custody of Amy during the pertinent time period. And while respondent-mother testified that she thought that Amy's father was giving the garnished child support money to petitioner, the father testified that he used the child support funds for his own purposes instead of for the support of Amy. Additional evidence which was introduced at the adjudication hearing indicated that respondent-mother was aware that Amy's father was incarcerated during most of the six-month period preceding the filing of the petition for termination of parental rights.

¶ 24    We emphasize that, with respect to its determination of the existence of abandonment here as a ground for termination of respondent-mother's parental rights, the trial court properly considered the fact that respondent-mother allowed her garnished wages for the support of Amy to be directed to the father rather than

to petitioner during the course of the relevant six-month time period regarding abandonment when petitioner had sole custody of the juvenile and respondent-mother admitted during the adjudication hearing that respondent-mother was aware of this arrangement. It is an uncommon circumstance for a parent such as respondent-mother to experience court-ordered wage garnishment in order to ensure that child support is received for the benefit of the child on one hand, while on the other hand the same non-custodial parent subject to garnishment is aware that these garnished child support payments are being received by the other parent who also does not have custody of the child. Despite respondent-mother's required compliance with the trial court's mandated wage garnishment in order to guarantee respondent-mother's payment of child support, nonetheless this consistency of payment of child support funds which was known by respondent-mother to be directed by the trial court to the father rather than to petitioner neither mandatorily qualifies this development as favorable for respondent-mother, nor mandatorily disqualifies it as unfavorable for respondent-mother, in the trial court's determination of the existence of the ground of abandonment. These aspects, combined with the trial court's evaluation of respondent-mother's testimony at the adjudication hearing regarding her assumption that the father was passing along to petitioner the child support payments which he was receiving and the trial court's assessment of the father's testimony at the adjudication hearing that he used the child support payments for

his own benefit rather than the support of the juvenile, were all proper for the trial court to include in its considerations in determining the existence of the ground of abandonment pursuant to the principles which this Court has announced in *In re Young* and *Pratt v. Bishop*.

¶ 25 In light of the evidence which was presented to the trial court regarding respondent-mother's abandonment of Amy as defined by N.C.G.S. § 7B-1111(a)(7), we determine that the findings of fact and resulting conclusion of law which respondent-mother disputes in the adjudication order must be upheld. The trial court was able to see and hear witnesses as they testified at the adjudication hearing, while assessing the witnesses' credibility and demeanor, in order to resolve any contradictions in the evidence in making the tribunal's findings of fact. On appeal, this Court is "bound by the trial courts' findings of fact where there is some evidence to support those findings, even though the evidence might sustain findings to the contrary." *In re M.C.*, 374 N.C. 882, 886 (2020) (quoting *In re Montgomery*, 311 N.C. at 110–11). Here, there is sufficient evidence to support each of the trial court's challenged findings of fact. The essential underlying findings of fact that would support the ultimate finding of fact and eventual conclusion of law that the ground of abandonment existed to permit the termination of respondent-mother's parental rights to Amy—that respondent-mother: did not visit with Amy; did not provide Amy with any correspondence, gifts, affection, or support; did not in any other manner

evince a desire to engage in parental duties or act in a parental manner; and was aware that although her wages were being garnished for the support of Amy, these funds were going to the father rather than to petitioner, who respondent-mother knew had custody of Amy—were proven by clear, cogent, and convincing evidence. Accordingly, we affirm the adjudication portion of the trial court's order.

## C. Best interests determination

¶ 26 The second stage of a termination of parental rights proceeding, which transpires only if at least one ground supporting termination of parental rights is found to exist at the adjudication stage, is a consideration of whether the disposition would be in the juvenile's best interests. *See* N.C.G.S. § 7B-1110(a) (2021). "If [the trial court] determines that one or more grounds listed in [N.C.G.S. §] 7B-1111 are present, the court proceeds to the dispositional stage, at which the court must consider whether it is in the best interests of the juvenile to terminate parental rights." *In re D.L.W.*, 368 N.C. 835, 842 (2016) (first citing *In re Young*, 346 N.C. at 247; and then citing N.C.G.S. § 7B-1110 (2015)). "At the disposition stage, the trial court solely considers the best interests of the child. Nonetheless, facts found by the trial court are binding absent a showing of an abuse of discretion." *In re J.H.*, 373 N.C. 264, 268 (2020) (quoting *In re N.G.*, 186 N.C. App. 1, 10 (2007)); *see also* N.C.G.S. § 7B-100(5) (2021) ("[T]he best interests of the juvenile are of paramount consideration . . . ."). An abuse of discretion is shown where a trial "court's ruling is

manifestly unsupported by reason or is so arbitrary that it could not have been the result of a reasoned decision." *In re T.L.H.*, 368 N.C. 101, 107 (2015) (quoting *State v. Hennis*, 323 N.C. 279, 285 (1988)).

The Juvenile Code provides that

> [i]n determining the best interests of a child during the dispositional phase of the termination of parental rights hearing, the trial court must make relevant findings concerning: (1) the age of the juvenile, (2) the likelihood of adoption, (3) whether termination will aid in the accomplishment of the permanent plan, (4) the bond between the juvenile and the parent, (5) the quality of the relationship between the juvenile and the proposed permanent placement, and (6) any relevant consideration.

*In re J.H.*, 373 N.C. at 270 (citing N.C.G.S. § 7B-1110(a) (2019)). In the present case, the trial court made specific findings of fact on each of the above-referenced statutory criteria.

Respondent-mother contends that the trial court abused its discretion in terminating respondent-mother's parental rights because the disposition was not in the best interests of Amy for several reasons, including: (1) the guardian ad litem did not recommend that respondent-mother's parental rights be terminated; (2) Amy did not want respondent-mother's parental rights to be terminated; and (3) the trial court's decision was arbitrary in that the parental rights of respondent-mother were

terminated in this action while the father's parental rights were not.[4] Upon review, none of respondent-mother's arguments succeed in establishing that the trial court abused its discretion in concluding that the termination of respondent-mother's parental rights was in Amy's best interests.

¶ 29     The portion of the trial court's order which addressed disposition included a finding of fact acknowledging that the guardian ad litem had not recommended the termination of respondent-mother's parental rights. In so doing, the trial court indicated that it had "considered the report and testimony of the guardian ad litem. The court, however, was not bound by that recommendation." *In re A.U.D.*, 373 N.C. 3, 11 (2019) (emphasis omitted) (citing *In re D.L.W.*, 368 N.C. at 843, for the proposition that the trial court must "consider all the evidence, pass upon the credibility of the witnesses, and determine the reasonable inferences to be drawn therefrom"). While the role of the guardian ad litem is critical in every juvenile case, with the testimony and reports of the guardian ad litem serving as important evidence at every phase of a case's proceeding, nonetheless a guardian ad litem's recommendation regarding the best interests of a juvenile at the dispositional stage

---

[4] Respondent-mother also contends that the trial court abused its discretion in finding that the termination of her parental rights was in Amy's best interests because the trial court erred in concluding that a ground existed to permit the termination of parental rights as specified in N.C.G.S. § 7B-1110. Having previously discussed the reasons why we reject respondent-mother's challenge to the trial court's determination that the ground of abandonment existed in this case, we do not revisit the issue here.

of a termination of parental rights case is not controlling. Rather, "because the trial court possesses the authority to weigh *all* of the evidence, the mere fact that it elected not to follow the recommendation of the guardian *ad litem* does not constitute error," let alone an abuse of discretion. *Id.* (emphasis added).

¶ 30    With regard to respondent-mother's claim that Amy did not want respondent-mother's parental rights to be terminated, respondent-mother's own presentation of the evidence on this circumstance is not as supportive of respondent-mother's stance concerning the juvenile Amy's wishes as respondent-mother unequivocally represents. Respondent-mother has submitted to this Court the following passage from the guardian ad litem's testimony at the trial court hearing:

> [W]hen I spoke to [Amy] about the termination she was very upset. The first thing in her mind she thought of is that she could possibly be taken out of [petitioner's] home. And so she did not want to be removed. However, when I— and at this time that I was speaking to her in terms of a termination about [respondent-mother] and [the father], because they were both still pending at that time, and [Amy] seemed to be upset about the idea of the termination, about not being able to speak to [respondent-mother and the father] again. She didn't have anything bad to say about either one of them. It was obvious that she understands that [petitioner] is her caregiver, her provider. But she had fond things to say about both [respondent-mother] and [the father]. And so when I asked her about not, you know, did she understand that if their rights were terminated that they wouldn't be her mom and dad anymore, and that, you know, she didn't have to speak to them, she may not, you know, be allowed to speak to them anymore. And she got visibly upset over that.
>      So I felt—that bothered me, that it hadn't been

> discussed with her, because she was so mature for her age. And maybe, you know, somebody should have went over that with her, especially before I popped in and, you know, broke, broke the news to her.

While respondent-mother gratuitously gilds this testimony of the guardian ad litem to indicate that Amy did not want respondent-mother's parental rights to be terminated, the guardian ad litem's account of Amy's reaction to the prospect of the termination of parental rights is more accurately depicted as the juvenile's apprehension about the legal and practical impact of such an outcome. Neutrally recounted, the guardian ad litem related that Amy feared being removed from petitioner's residence; that Amy made fond comments about respondent-mother and the father; that Amy was upset by the idea that Amy would not be able to speak to respondent-mother and the father if their parental rights were terminated; and that Amy should have had the legal proceeding and its effects reviewed with her prior to the hearing's occurrence. There is nothing in this segment of the guardian ad litem's testimony which is cited by respondent-mother to indicate that Amy did not want respondent-mother's parental rights to be terminated and nothing from which we can conclude that the trial court abused its discretion in determining that the termination of respondent-mother's parental rights was in the juvenile Amy's best interests.

¶ 31　　　Respondent-mother's remaining argument regarding the best interests determination by the trial court is that the forum abused its discretion in that "[t]here is an overall inequity in allowing [the father] to maintain a relationship with Amy

while terminating [respondent-mother's] rights. . . . [Respondent-mother] was not a worse parent than [the father]. Treating her differently amounted to an abuse of discretion." The proper focus of the trial court at the dispositional phase of the case was on the best interests of *Amy*, not the equities between *the parents*. *In re J.H.*, 373 N.C. at 268. The trial court did not abuse its discretion in this regard.

¶ 32        We conclude that the trial court properly exercised its discretion to make a reasoned decision regarding the issue of whether termination of respondent-mother's parental rights was in Amy's best interests.

### III.    Conclusion

¶ 33        In conclusion, this Court holds that petitioner established her standing pursuant to statutory requirements to bring the underlying petition, that the evidence before the trial court sufficiently demonstrated the existence of a statutory ground for termination, and that the trial court did not abuse its discretion in concluding that termination of respondent-mother's parental rights was in the juvenile Amy's best interests.

AFFIRMED.

Justice EARLS concurring.

I agree that petitioner has standing to bring this action against respondent-mother for the reasons articulated by the majority. I write separately on the question of whether the trial court's findings of fact support its legal conclusion that: "Petitioner has proven by clear, cogent, and convincing evidence that Respondent has abandoned the minor child within the meaning of North Carolina General Statutes § 7B-1111(a)(7)." We have recently held that "[i]f a parent withholds his presence, his love, his care, the opportunity to display filial affection, and *willfully neglects to lend support and maintenance*, such parent relinquishes all parental claims and abandons the child." *In re E.H.P.,* 372 N.C. 388, 393 (2019) (emphasis added). Applying that precedent to this case, the challenge is that respondent-mother consistently paid child support of $216 a month during the relevant six-month period preceding the filing of the petition for termination of parental rights, that is, from 13 November 2018 to 13 May 2019. Indeed, she had been regularly paying child support monthly for seven years before the termination hearing and was not in arrears.

I write separately because in my view, fidelity to our precedents requires that we acknowledge that fact as cutting against, rather than supporting, the ultimate legal conclusion that respondent-mother abandoned her daughter. On balance, the trial court's other findings are sufficient to support a conclusion of abandonment, and thus I agree with the majority's ultimate conclusion on this

issue. However, I do not agree with the majority that respondent-mother's awareness that her child support payments, which were paid pursuant to a court order and directly garnished from her wages, went to the child's father and not directly to petitioner, are evidence of her abandonment of her daughter.

¶ 36        While the statutory language does not support a conclusion that payment of child support alone during the relevant six-month period is an absolute bar to a finding of abandonment, the Court of Appeals has considered the payment of child support as one factor to be considered. In *In re T.C.B.,* for example, the court recited the facts regarding a father's payment of child support and concluded that "[t]hese findings regarding the payment of child support further serve to undermine the district court's conclusion of willful abandonment." *In re T.C.B.,* 166 N.C. App. 482, 488 (2004). Similarly, in *In re K.C.,* the fact that respondent-mother had paid court-ordered child support was one factor, among others, such as attending nine visitations during an eighteen-month period and speaking with her son on the phone several times, showing that her actions "are not consistent with abandonment as defined under North Carolina law." *In re K.C.,* 247 N.C. App. 84, 88 (2016).

¶ 37        To be sure, the Court of Appeals has also found that abandonment may

occur even when child support was being paid or was paid inconsistently. *See, e.g., In re C.J.H.,* 240 N.C. App. 489, 504 (2015) (affirming finding of abandonment despite the fact that respondent made "last-minute child support payments and requests for visitation," because during the relevant period "respondent did not visit the juvenile, failed to pay child support in a timely and consistent manner, and failed to make a good faith effort to maintain or reestablish a relationship with the juvenile"); *In re Adoption of Searle,* 82 N.C. App. 273, 276 (1986) (evidence of one $500 payment by respondent — without any other activity during the relevant time period — was sufficient to support determination that father willfully abandoned child). But all these precedents together stand for the proposition that payment of child support, whether by court order or otherwise, is a relevant factor to consider in determining whether the statutory ground of abandonment has been established.

Here, the majority concludes that it was proper for the trial court to consider testimony about what respondent-mother knew regarding whether the father was using her child support payments for the benefit of the child, but maintains that evidence of consistent child support payments is not "mandatorily" favorable or unfavorable to respondent-mother on the question of abandonment. However, the trial court's order includes a "Finding of Fact"

that "[r]espondent had an affirmative duty to do something, and her failure to do so is further evidence forsaking her parental responsibilities." This is not a "fact," nor is it an accurate statement of the law. Rather, our case law establishes that petitioner has the burden of proving, for the ground of abandonment, that respondent-mother "willfully neglect[ed] to lend support or maintenance," among other things. *See In re E.H.P.*, 372 N.C. at 393. Petitioner must put forward clear and convincing evidence that respondent-mother's conduct "manifest[ed] a willful determination to forego all parental duties and relinquish all parental claims to the child." *In re Young,* 346 N.C. 244, 252 (1997). In this case, respondent-mother had an affirmative duty to comply with the court order regarding payment of child support, which she did. She did not have "an affirmative legal duty to do something" more. The fact of her consistent child support payments does not bar the ultimate conclusion of abandonment here, but the majority errs in failing to acknowledge that this factor weighed in respondent-mother's favor.